### Stephen BUCKLEY, Plaintiff–Appellee–Cross–Appellant,

v.

### J. Michael FITZSIMMONS, et al., Defendants–Appellants–Cross–Appellees.

### Nos. 89–2441, 89–2899 and 89–2900.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1990.

Decided Dec. 5, 1990.

As Amended on Grant of Clarification Jan. 14, 1991.

G. Flint Taylor, John L. Stainthorp, Peoples Law Office, Chicago, Ill., for plaintiff-appellee.

James G. Sotos, Charles E. Hervas, James R. Schirott, Michael W. Condon, Schirott & Associates, Itasca, Ill., Mary P. Wetting, Office of Atty. Gen., Topeka,

Kan., for defendant-appellant County of DuPage.

Charles E. Hervas, Phillip A. Luetkehans, James G. Sotos, James R. Schirott, Michael W. Condon, Schirott & Associates, Itasca, Ill., Steve A. Schwarm, Asst. Atty. Gen., Office of Atty. Gen., Topeka, Kan., for defendant-appellant J. Michael Fitzsimmons.

James G. Sotos, Charles E. Hervas, James R. Schirott, Michael W. Condon, Schirott & Associates, Itasca, Ill., Steve A. Schwarm, Asst. Atty. Gen., Topeka, Kan., for defendants-appellees Thomas Knight, Patrick King, James Ryan and Robert Kilander.

Before WOOD, Jr., and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Probable cause is enough to initiate a criminal prosecution. It takes proof beyond a reasonable doubt to convict. That difference, together with uncertainties in what the evidence will show, implies that some innocent persons will be prosecuted. Trial is supposed to filter out the innocent, a task it serves well if imperfectly.

Accusation and trial are wrenching experiences, especially for the innocent. On top of trauma comes expense and often the loss of freedom pending disposition. How should society respond when an innocent person is prosecuted? Apologies are mild balm at best. Money is more effective. Compensation not only would aid the involuntary participant in the criminal justice system but also would induce prosecutors to evaluate cases more carefully, taking account of the costs to the defendants. Yet prosecutors rarely apologize, and states do not compensate defendants acquitted by the jury, or against whom charges are dropped. Often neither apology nor compensation is in order, because the suspect is guilty but for one reason or another is not convicted. Sometimes both are called for, but they are almost never forthcoming.

Innocent defendants, rightly feeling put upon, may respond to this governmental indifference by turning on their accusers, making them defendants in turn. They demand that the prosecutors, police, and witnesses dig into their own pockets to provide recompense. If courts could quickly and reliably identify malicious prosecutions, those in which the case was manufactured or conviction unattainable, it might make sense to award damages, to cause prosecutors with the power to destroy others' lives to do their jobs with the care that their responsibilities require. But the legal system is neither quick nor infallible. To allow a search for malicious or weak prosecutions is to license litigation at any defendant's option. And if malicious prosecutions are rare, then even a low rate of error in suits against prosecutors will lead to more false positives than to vindication of just claims. Given the error inevitable in our legal system—in criminal prosecutions as well as in follow-on civil litigation—a system of personal liability for prosecutors and witnesses would do more to discourage the activity of criminal prosecution (or testifying) than to make the prosecutors and witnesses more careful and honest. Because criminal prosecutions regularly do more good than bad, and because prosecutors have no way to use these social benefits to offset the damages they could be called on to pay when their activities injure the innocent, courts have concluded that both prosecutors and witnesses generally are immune from damages on account of errors. *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

How far does this immunity extend? Does it cover the process of investigating and evaluating a case as well as the trial itself? If so, it could throw a blanket of immunity over acts that may lead to liability when performed by police, see *Jones v. Chicago*, 856 F.2d 985 (7th Cir.1988); *Smith v. Springer*, 859 F.2d 31 (7th Cir. 1988), decision after remand under the name *Smith v. Chicago*, 913 F.2d 469 (7th Cir.1990). If not, criminal defendants can evade the immunity established by *Imbler*

by asserting that, before the trial began, the prosecutors prepared to do precisely what they did. That would create the same risk of error, and exposure to retaliatory counterstrikes, that *Imbler* and *Briscoe* are meant to avert. We must decide how far immunity doctrines extend in a world in which the most logical option, governmental liability, may well be closed by *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

## I

Jeanine Nicarico, 10 years old, was home with the flu on Friday, February 25, 1983. Her mother Patricia, a teacher, came home to fix lunch for Jeanine, then returned to school. Not long after that someone kicked in the front door to the Nicarico home, trussed Jeanine up in bedclothes, and carried her off. Marks on the walls and door jamb bore mute witness to her efforts to resist. The intruder took no valuables—nothing other than the blanket and its occupant. *People v. Hernandez*, 121 Ill.2d 293, 117 Ill.Dec. 914, 915–16, 521 N.E.2d 25, 26–27 (1988).

The kidnapper drove Jeanine into the country and pulled her nightgown over her head. Unsuccessful in a determined attempt to penetrate her vagina, the kidnapper raped Jeanine in the anus. Now he became her assassin. He caved in her skull with five blows from a tire iron or baseball bat and threw her into the mud 45 feet off the Illinois Prairie Path, a hiking trail. Jeanine died within four hours of the time she ate lunch with her mother. The police found the body on February 27, and the manhunt began.

John Sam, the detective with the DuPage County Sheriff's Police leading the investigation, concentrated on the principal clue the intruder left behind: a clear print (the "bootprint") of the sole of a shoe appeared on the Nicaricos' door. While other detectives interviewed neighbors and persons who might have seen the kidnapper drop Jeanine's body near the trail, Sam tried to find the owner of the shoe. A $10,000 reward attracted Alex Hernandez, a petty thief with low intelligence and a desire to become a police officer. Hernandez said that he overheard a conversation between Stephen Buckley and "Ricky" in which "Ricky" talked about the crime. Sam tracked down Buckley, an unemployed high school dropout. Buckley admitted having shoes with soles like those in the bootprint on the door. He brought them to Sam for analysis.

John Gorayczyk, the head of the identification section in the DuPage County crime laboratory, decided that Buckley's shoes did not match the bootprint: the soles were the same, but the heels were a little different. Edward R. German, a forensic scientist in the Illinois state crime laboratory, was only a little more positive: he concluded that Buckley's shoe "could have at best" made the print. Prosecutors then sent the shoe to Robert Olsen, with the Kansas Bureau of Identification, who concluded that Buckley's shoe "probably" matched the marks on the door. Prosecutors also brought in Louise Robbins, a professor of anthropology at the University of North Carolina at Greensboro. Robbins, who later testified that she could identify the wearer of a shoe with certainty even if she had only prints made with different shoes, concluded that Buckley positively made the marks on the Nicaricos' door.

Meanwhile the investigation was proceeding on other fronts. Two witnesses—one near the Nicaricos' house, another near the Prairie Path—identified Buckley as the driver of a green Ford Granada, missing a hubcap, that left the neighborhood and arrived at the Prairie Path at the right times. These witnesses were positive, even though their earlier descriptions did not match Buckley's features. (One of them initially told police that the driver, in his late 20s or early 30s, wore granny glasses and was clean shaven; Buckley, 20, had a mustache and does not wear glasses.) Hernandez said that he took some role in Jeanine's abduction and implicated Rolando Cruz, who also confessed (although neither to the rape nor to the murder); both said that Buckley drove the car. Neither Cruz nor Hernandez, both of whom have substantially below average intelligence, could give

important details of the offense, but some circumstantial evidence implicated each.

John Sam arrested Buckley, Cruz, and Hernandez, and they were put on trial for their lives. But Sam began to question the conclusion that the three did it—partly because of discrepancies in the identifications and other details (witnesses reported only a single person in the car); partly because none of the three had a record of sex offenses; partly because Cruz and Hernandez contended that they came to burgle the Nicarico house and took some items, though nothing was missing; but mostly because he was convinced that men who violate little girls do not work in teams. Sex crimes he had solved were solitary aggressions. Sam told his superiors they had the wrong defendants. When they would not listen, Sam quit the force and offered to testify for the defense. James Tuohy, *The DuPage Cover-Up*, Chicago Lawyer 1, 9–14 (May 1986).

A jury convicted Cruz and Hernandez of murder, among other crimes, and the judge sentenced both to death. It was unable to reach a verdict about Buckley, and the prosecutor scheduled a second trial. While prosecution and defense were preparing for retrial, police in LaSalle County arrested Brian Dugan for the abduction, molestation, and murder of 7 year old Melissa Ackerman. Discussing the charges with his lawyer, Dugan admitted two other rape-murders: Donna Schnorr and Jeanine Nicarico. He furnished details for each, many of which had never been publicized. He also told his lawyer that after killing Jeanine he threw away the shoes he wore. Soles of the shoe style Dugan says he bought at a Fayva store matched the boot-print at least as closely as Buckley's, probably better. A farmer in the area where Jeanine's body was found recalls plowing up a pair of boots in 1983.

Dugan, 29, had a history of violent sex offenses, always solitary. His lawyer used the admissions and a willingness to plead guilty to all three crimes to avoid the death penalty. Dugan would give no statement creating a risk of capital punishment. La-Salle County made the deal, and Dugan is in jail for life on account of the Schnorr and Ackerman slayings. But prosecutors in DuPage County refused to accept Dugan's offer, concluding that his admissions were unreliable. Although Dugan furnished many details that checked out, he also claimed that Jeanine was so well bound that she did not grab anything as they left; the walls of the Nicarico house testified to the contrary.

As DuPage County was preparing to put Buckley on trial a second time, Louise Robbins died. No one else was willing to testify that the bootprint inexorably showed Buckley's guilt. James Ryan, State's Attorney for DuPage County, dismissed the charges against Buckley. He was released in March 1987 after three years in prison; he had been unable to post the $3 million bond. In January 1988 the Supreme Court of Illinois reversed the convictions of Cruz and Hernandez on the basis of *Bruton* violations at trial: the prosecutor introduced each man's confession implicating the other, and the substitution of euphemisms for names did nothing to hide the accusations from the jury, the court held. *Hernandez*, 117 Ill.Dec. at 21–26, 521 N.E.2d at 32–37; *People v. Cruz*, 121 Ill.2d 321, 117 Ill.Dec. 907, 521 N.E.2d 18 (1988). See also *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) (rejecting the interlocking confessions exception to *Bruton*). The court did not forbid retrial, concluding that the evidence is sufficient to allow a jury to find guilt. Cruz and Hernandez were retried. Cruz was convicted and has again been sentenced to death. Hernandez's case was mistried because the jury could not agree; Ryan has announced that he will take Hernandez to trial a third time.

Buckley filed this suit under 42 U.S.C. § 1983 in 1988. He contends that almost everyone connected with the investigation and prosecution violated his constitutional rights and should be made to pay damages. J. Michael Fitzsimmons, State's Attorney for DuPage County at the time of Buckley's indictment, is the lead defendant. Ryan is among the other defendants, who include the Sheriff of DuPage County, many members of the Sheriff's police,

many prosecutors on the State's Attorney's staff, three experts who analyzed the bootprint (German, Olsen, and Robbins), and DuPage County itself.

Everyone who had anything to do with this prosecution, other than Sam and Gorayczyk, has a place in Buckley's rogues' gallery. His complaint contends that all participated in a conspiracy to execute him, although all knew that he is innocent. The ringleader, as Buckley sees things, is Fitzsimmons, who wanted to solve the Nicarico murder to boost his popularity. State's Attorney since 1976, Fitzsimmons was running against Ryan in the Republican primary in spring 1984. To give his campaign a boost, the complaint alleges, Fitzsimmons convened a special grand jury and instructed his assistants to produce an indictment. Buckley narrates a tale of coercive interrogations in 1983 and 1984 by police and prosecutors, arm-twisting of experts that led them to "find" similarities between his shoes and the bootprint, misleading presentations to the grand jury, indictment, and stubborn refusal to dismiss the case despite Dugan's confession. Fitzsimmons announced the indictment at a press conference on March 9, 1984; Buckley maintains that this also violated his rights by turning the community against him, reducing the chance that he could obtain bail or a fair trial. The complaint is full of particulars; we take them as gospel, but the usual caveat applies.

Most of the defendants moved to dismiss the complaint on grounds of immunity, absolute or qualified. DuPage County moved to dismiss on the ground that § 1983 does not establish vicarious liability, see *Monell*, 436 U.S. at 691–95, 98 S.Ct. at 2036–38, and that neither the Sheriff nor the State's Attorney made "policy" for the County, so it could not be liable directly. The district judge delivered a split decision. 1989 WL 64321, 1989 U.S. Dist. LEXIS 6689 (N.D.Ill. 1989). Ryan and all of the assistant prosecutors prevailed under *Imbler;* the judge concluded that convening the grand jury, presenting information to it, preparing the case (including the expert witnesses), and even interviewing Buckley are covered by absolute immunity. The three expert witnesses received absolute immunity under *Briscoe* and *Kincaid v. Eberle*, 712 F.2d 1023 (7th Cir.1983), for their out-of-court preparation as well as for their testimony. Fitzsimmons prevailed on all claims but one: the judge concluded that his announcement of the indictment to the press was not covered by absolute immunity. DuPage County, however, lost. Although the court concluded that state's attorneys are state rather than local officials, so that Fitzsimmons and Ryan were not policymakers for the county, it concluded that the sheriffs are final policymakers for their counties. Acts of the Sheriff therefore could be the basis of liability for DuPage County, *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and the court retained the county in the case.

At this point the county, Fitzsimmons, the Sheriff, and members of the Sheriff's police remained as defendants. It was time to start discovery. Instead, almost everyone appealed. Naturally the first question is appellate jurisdiction.

## II

■ Fitzsimmons' appeal from the order refusing to accord him absolute immunity is within our jurisdiction on the authority of *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), which holds that the denial of a substantial claim of absolute immunity is immediately appealable under 28 U.S.C. § 1291. Jurisdiction over the other appeals depends on Fed.R.Civ.P. 54(b), which allows the court to enter final judgment on particular claims or parties. At all parties' request, the district judge entered a judgment designed to allow appeals to be taken under Rule 54(b). More than a year after entering the orders, and after oral argument in this court, the district judge also certified a question for interlocutory appeal under 28 U.S.C. § 1292(b). We start with Rule 54(b).

■ Rule 54(b) does not allow a judge to certify for interlocutory decision issues such as "Is a sheriff a policy-maker for counties in Illinois?" When an issue is

unresolved and interlocutory resolution could materially advance the termination of the litigation, § 1292(b) allows the district judge to certify the question. The court of appeals decides whether to entertain the appeal. Rule 54(b) serves a different function: carving out of a complex case individual claims that have been finally resolved. *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437–38, 76 S.Ct. 895, 900–01, 100 L.Ed. 1297 (1956). Rule 54(b) allows a court to "direct the entry of a final judgment as to one or more but fewer than all of the claims or parties" but does not change the ordinary meaning of "final". So it does not authorize appeal of decisions that, if made in stand-alone litigation, would not be "final". *Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976); *Horn v. Transcon Lines, Inc.*, 898 F.2d 589 (7th Cir.1990). Unless the court enters final judgment on an entire "claim", or wraps up the case with respect to all claims involving a particular party, Rule 54(b) does not permit an immediate appeal. E.g., *Steve's Homemade Ice Cream, Inc. v. Stewart*, 907 F.2d 364 (2d Cir.1990); *FDIC v. Elefant*, 790 F.2d 661, 664 (7th Cir.1986); *Horn*, 898 F.2d at 593–95.

The district judge entered judgment in favor of Ryan, the assistant prosecutors, and the three expert witnesses. Buckley's appeal puts all of these before us. Fitzsimmons and DuPage County, however, continue to be parties in the district court. Demands against them may be brought here only if the district judge has finally determined entire "claims" for relief. DuPage County moved for dismissal on the ground that neither the State's Attorney nor the Sheriff set policy for the county. That motion was denied. The court knocked out one of Buckley's theories but refused to dismiss the claim. Further proceedings lay in store. The denial of a motion to dismiss (or for summary judgment) is not a "final" decision. More than two weeks after oral argument DuPage County moved to dismiss its appeal, agreeing with Buckley's argument, first made in his brief on the merits, that the court lacks jurisdiction; that motion is granted.

Jurisdiction over Buckley's appeal against Fitzsimmons and DuPage County depends on the meaning of "claim" in Rule 54(b). We understand a "claim" for purposes of Rule 54(b) to mean factually or legally connected elements of a case. *Horn*, 898 F.2d at 592. "It has seemed to us implicit in the rule that the retained and the appealed claims must be factually distinct, for otherwise the court of appeals may be forced to analyze the same facts in successive appeals, a form of piecemeal appealing not authorized by the rule." *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1366 (7th Cir.1990). The claim against Fitzsimmons remaining in the district court is factually related to the claims on which he prevailed; indeed, Buckley alleges that the announcement of the indictment and Fitzsimmons' other acts are all part of a single plan. Similarly, the claim that DuPage County set a "policy" through the decisions of the two states' attorneys is factually related to the claim that it set a policy by the decisions of the Sheriff. Buckley alleges one conspiracy, one policy, one injury.

*Olympia Hotels* expresses unease with the circuit's definition of a "claim", recognizing that judicial resources may be conserved rather than squandered by accelerating decision on a controlling issue, even if there is a chance that related questions could recur. Of course one cannot go too far with this recognition: jurisdiction is a question of judicial power, not of convenience. When immediate review could materially advance the termination of the litigation, § 1292(b) supplies the route but allows the court of appeals to exercise discretion, a filter missing in appeals under Rule 54(b). The rule does not allow the entry of judgments that would not be "final" within the meaning of § 1291, see *Horn*, 898 F.2d at 593–94, and a decision foreclosing one theory of liability while leaving others open is not "final" on any understanding of that term.

Still, how much factual overlap is too much is a question of degree, and *Olympia* properly observed that Rule 54(b) commits the decision on such matters to the in-

formed discretion of the district judge. 908 F.2d at 1367–68. Such discretion, thoughtfully exercised, will rarely be disturbed. Unfortunately, nothing in this record suggests that the district judge has "assess[ed] the desirability of immediate judgment and unequivocally give[n] an affirmative answer." *Local P–171 v. Thompson Farms Co.*, 642 F.2d 1065, 1073 (7th Cir. 1981). After Fitzsimmons took an appeal from the denial of his motion to dismiss, the parties presented the district judge with an "agreed order directing entry of final judgment". The judge signed this order. What the parties prepared for the judge contains no discussion of the relation between the claims finally disposed of and those remaining for decision, no appreciation of the potential for successive decision and weighing the benefits of immediate resolution against the cost to the judicial system. For all we can see, the district judge gave no consideration to systemic interests in preserving the norm of one appeal per case—and of minimizing the number of appeals if there must be more than one. Indeed, nothing suggests that the judge recognized that he was entering a "final judgment" *denying* a motion to dismiss! We have remarked before that district judges may not reflexively enter Rule 54(b) judgments just because the parties want to appeal. *Horn*, 898 F.2d at 592; see also *Glidden v. Chromalloy American Corp.*, 808 F.2d 621, 624 (7th Cir.1986).

■ According to the complaint there was a single conspiracy in which the Sheriff and both State's Attorneys participated, producing a "policy" of prosecuting the innocent. Whether adopted through the Sheriff or the State's Attorneys, this single "policy" is the basis of the claim. No matter what we would say about the State's Attorney's role as a policymaker for counties in Illinois, the same set of facts would come back later concerning the Sheriff's role; legal issues also would be similar. Because governmental bodies are not entitled to official immunity, *Owen v. Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the questions about DuPage County are unrelated to the immunity

issues presented in the appeals properly before us. Buckley's "claim" against the county therefore has yet to yield a "final" decision appealable under Rule 54(b). We dismiss Buckley's appeal to the extent it asks us to decide whether DuPage County may be liable on account of the State's Attorneys' decisions.

■ Buckley's appeal against Fitzsimmons encounters the same problem. Although the court concluded that Fitzsimmons has absolute immunity from liability on account of most of the incidents about which Buckley protests, it did not dismiss the claim or grant summary judgment in Fitzsimmons's favor. That is why Fitzsimmons is appealing, as he is entitled to do even though the decision is interlocutory. Buckley may appeal, though, only if the decision is "final" within the meaning of Rule 54(b), and it is not.

Is this inconsistent? Fitzsimmons's appeal depends on a conclusion that the decision denying his motion to dismiss is "final" within the meaning of 28 U.S.C. § 1291. "Finality" means the same thing under § 1291 and Rule 54(b), see *Horn*, 898 F.2d at 593–94, for the rules do not enlarge jurisdiction. See Fed.R.Civ.P. 82; Fed.R. App.P. 1(b). What is "final" about the decision, though, is only the conclusion that the case must proceed. Fitzsimmons lost his "right not to be tried" and to avoid discovery, ingredients of immunity separate from an entitlement to prevail on the merits. *Mitchell v. Forsyth*, 472 U.S. 511, 524–29, 105 S.Ct. 2806, 2814–17, 86 L.Ed.2d 411 (1985); *Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979). Finality of this kind is a one-way street; only the holder of the "right not to be tried" may appeal, because only he experiences a "final" decision.

■ Perhaps Buckley could invoke pendent appellate jurisdiction. That concept sometimes allows a court to consider extra issues in an interlocutory appeal. *Illinois ex rel. Hartigan v. Peters*, 861 F.2d 164 (7th Cir.1988); *Patterson v. Portch*, 853 F.2d 1399 (7th Cir.1988). We could assume jurisdiction of Buckley's appeal against

Fitzsimmons only if the doctrine allows the addition of *appellants* as well as *issues*. Just as pendent-party jurisdiction in the district court is harder to support than is the addition of issues, *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), so pendent-party appellate jurisdiction is especially problematic. *Abney v. United States*, 431 U.S. 651, 662–63, 97 S.Ct. 2034, 2041–42, 52 L.Ed.2d 651 (1977), tells us not to allow interlocutory appeals to acquire barnacles. Although *Abney* is a double jeopardy case, it is the foundation for the entitlement to immediate appeal when the defendant asserts a right not to be tried. Its flat conclusion that each issue, and presumably each party, must find a separate basis of appellate jurisdiction governs in other cases of the same stripe. We therefore dismiss Buckley's appeal to the extent he seeks relief against Fitzsimmons.

■ What remains is the belated certification under § 1292(b). Just as the parties wrote for the judge a Rule 54(b) judgment, which he signed without comment, so they wrote for him a § 1292(b) certification, which again he signed without change. Again the parties' draftsmanship and timing leaves much to be desired. Here is the operative part of the order they wrote for the judge:

> In this Court's opinion, its memorandum opinion and order of June 9, 1989 involves a controlling issue of law as to which there is [sic] substantial grounds for difference of opinion and that an immediate appeal from this order may materially advance the ultimate termination of the litigation. This issue is, inter alia, whether the State's Attorney and/or Sheriff of DuPage County are county officials and/or policymakers for purposes of *Monell* liability under 42 U.S.C. § 1983.

Section 1292(b) requires the court to identify the issues, not to assert that one issue is important "inter alia"; we expect the court to *explain* why, rather than assert that, immediate appeal will materially advance the disposition. Courts should do their own writing. If they allow lawyers to draft for them, they should at least see to it that the lawyers have everything in order.

There is also a deeper flaw: delay. Appeals must be taken within a short time after the entry of the orders appealed from, and § 1292(b) sets one of the shortest limits at ten days. Although Fed.R. App.P. 5(a) allows a judge to amend the ruling to add a § 1292(b) certification at any time, we held in *Weir v. Propst*, 915 F.2d 283, 287 (7th Cir.1990), that this power must not be used promiscuously. "An amendment that will have the effect of extending the limitation is proper only if there is a reason for the delay." In *Weir* neither the parties nor the judge gave a reason for the delay; we declined to accept the appeal. So here. Judge Leinenweber is silent on the question (the parties neglected to draft for him with *Weir* in mind), and the joint motion for leave to appeal gives as a reason only the skepticism expressed at oral argument about jurisdiction under § 1291. *That* jurisdictional problem is largely attributable to the parties, and at all events the problem with the Rule 54(b) judgment was first flagged by the plaintiff's brief, filed in January 1990. Delay after that is unjustifiable, and we decline to accept an appeal from a certification made after oral argument in this court.

### III

*Imbler* reserved all questions concerning the extent to which absolute prosecutorial immunity applies to investigation and preparation for trial. 424 U.S. at 430–31 & n. 33, 96 S.Ct. at 995–96 & n. 33. Some may be resolved this Term. *Burns v. Reed*, 894 F.2d 949 (7th Cir.), cert. granted, —— U.S. ——, 110 S.Ct. 3269, 111 L.Ed.2d 779 (1990). In the interim we must reach a decision influenced by the functions immunity serves.

Buckley maintains that absolute immunity is limited to the trial itself. Fitzsimmons and the other defendants submit that anything leading up to trial is within the scope of absolute prosecutorial immunity. Responding to a question at oral argument, counsel for Fitzsimmons said that prosecu-

torial immunity would be absolute even if prosecutors tortured Buckley to obtain a confession. Neither of these limiting positions can be right.

Buckley's position would turn *Imbler* into a pleading rule. Anyone wishing to challenge his prosecutors would need only challenge the investigatory and preparatory steps that precede every prosecution, throwing in the appellation "conspiracy" for good measure. Immunity is not limited to cases filed and tried without investigation or planning; why should it protect only irresponsible prosecutors? Buckley wants to relitigate the merits of the criminal charge against him and to recover damages if the charge was unfounded; prosecutorial immunity prevents turning the tables in this fashion. *Imbler*, 424 U.S. at 425, 96 S.Ct. at 992; *Butz v. Economou*, 438 U.S. 478, 512–17, 98 S.Ct. 2894, 2913–16, 57 L.Ed.2d 895 (1978); *Mitchell v. Forsyth*, 472 U.S. 511, 522–23, 105 S.Ct. 2806, 2813–14, 86 L.Ed.2d 411 (1985). See also *Yaselli v. Goff*, 12 F.2d 396 (2d Cir.1926), affirmed, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927). If absolute immunity has value—as the Supreme Court believes it does—we must prevent its evasion.

Fitzsimmons and the other defendants are wrong because immunity applies to the act, not the actor. *Forrester v. White*, 484 U.S. 219, 227, 108 S.Ct. 538, 544, 98 L.Ed.2d 555 (1988). An Attorney General who approves a national security wiretap does not have absolute immunity, even though the information may lead to prosecution. *Mitchell*, 472 U.S. at 520–24, 105 S.Ct. at 2812–14. Courts regularly hold that prosecutors filling the roles of detectives must face the music for wrongs committed against suspects to the same extent as detectives do. E.g., *Auriemma v. Montgomery*, 860 F.2d 273 (7th Cir.1988); *Hampton v. Chicago*, 484 F.2d 602 (7th Cir.1973). Police who use the third degree in interrogation, or break open doors, must show that their acts were objectively reasonable; the security of personal rights would be markedly diminished if the state could investigate at will, and without risk, by shifting the same functions to lawyers. Immunity is absolute only when the prose-

cutor performs distinctively prosecutorial functions.

### A

Because immunity follows the act rather than the actor, it is essential to define "prosecutorial" acts. Any definition must depend in turn on why courts extend immunity to prosecutors in the first place. Why not use damages to induce proper conduct in every case? Because damages would lead prosecutors to temper their judgment. Tempering might be an acceptable cost of a damages regimen if the costs of prosecutorial errors were high, but the criminal process itself offers sufficient opportunities to prevent harms, so that damages remedies are unnecessary. These considerations imply an appropriate scope of immunity.

Litigation has losers. They may "transform [their] resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate". *Imbler*, 424 U.S. at 425, 96 S.Ct. at 992. Even the winners may be losers. Defendants may spend days, even years, in prison awaiting trial, as Buckley did. Yet litigation would be even more difficult and costly than it is if, after the first trial, there were a second with the positions of the parties reversed. Prosecutors, whose professional duties necessarily make the lives of some uncomfortable, would be special targets. Attorneys for the government could protect themselves from retaliation by quiescence. Victims of crime cannot compel prosecution of offenders or collect damages from passive prosecutors. *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Leeke v. Timmerman*, 454 U.S. 83, 102 S.Ct. 69, 70 L.Ed.2d 65 (1981). Society does not reward prosecutors for convicting the guilty; requiring prosecutors to compensate defendants for injury inflicted without giving them a bonus for the benefits they create would create a bias: in close cases it would always pay to forego prosecution. Yet society prefers to induce such prosecutions. Putting a case before a court is no evil, even when there is reason to doubt its strength. "A prosecutor often must de-

cide, especially in cases of wide public interest, whether to proceed to trial where there is a sharp conflict in the evidence. The appropriate course of action in such a case may well be to permit a jury to resolve the conflict. Yet, a prosecutor understandably would be reluctant to go forward with a close case where an acquittal likely would trigger a suit against him for damages." *Imbler*, 424 U.S. at 426 n. 24, 96 S.Ct. at 993 n. 24.

Prosecutors should (and most routinely do) take account of the costs they inflict on others. If suits were the only way to impress prosecutors with the gravity of these costs, damages could be a necessary evil—which is why police officers and even attorneys general do not possess absolute immunity when conducting investigations. Courts can curtail the costs of prosecutorial blunders without the need for damages, however, by cutting short the prosecution or mitigating its effects. *Mother Goose Nursery Schools, Inc. v. Sendak*, 770 F.2d 668, 674 (7th Cir.1985). "[S]afeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Butz*, 438 U.S. at 512, 98 S.Ct. at 2914. Judges are involved early on. The principal cost of wrongful prosecution is the imprisonment of the defendant before trial. Yet imprisonment depends on a demonstration of probable cause in court. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Even after the prosecutor establishes probable cause, the judge may release the defendant on bail or ameliorate the harshness of imprisonment. Prosecutorial action is a necessary *but not sufficient* condition of imprisonment; injury will not long continue unless one or more judges is impressed with the gravity of the charge and the weight of the evidence assembled. If the evidence is enough to satisfy a judge, there is correspondingly less reason to blame the prosecutor. Of course there may be some reason; maybe the evidence has been cooked. Cf. *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Jones v. Chicago*, 856 F.2d at 994. Absolute immunity depends on a judgment that the proba-

bility of putting one over on a court is sufficiently low, and the burden of litigation afterward to determine *whether* prosecutors made up the case sufficiently high, that attempts to litigate the question should be foregone. This is a reasonable judgment when a court can step in early, curtailing the injury; it is not a sound conclusion when an act (by prosecutor or police officer) causes injury that is complete before the case reaches court. See *Mitchell.*

Prosecution causes injuries in addition to imprisonment. Accusations of crime impugn the good name of defendants. Trial is an unpleasant experience as well as an expensive one. But these injuries, too, may be curtailed by judicial action. Residual injuries have never been deemed sufficient to call for damages against public prosecutors, or even for such medicaments as interlocutory appeals. E.g., *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989); *Flanagan v. United States*, 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984); *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982); *Cobbledick v. United States*, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940). Expense and inconvenience are endemic to any legal system; the costs of justice in ours do not imply either especially prompt review or damages afterward. See *FTC v. Standard Oil Co.*, 449 U.S. 232, 244, 101 S.Ct. 488, 495, 66 L.Ed.2d 416 (1980); *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 24, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123 (1974); *Petroleum Exploration, Inc. v. Public Service Comm'n*, 304 U.S. 209, 222, 58 S.Ct. 834, 841, 82 L.Ed. 1294 (1938); *PaineWebber Inc. v. Farnam*, 843 F.2d 1050 (7th Cir.1988).

■ All of this suggests a simple demarcation. If the injury flows from the initiation or prosecution of the case, then the prosecutor is immune and the defendant must look to the court in which the case pends to protect his interests. If, however, a constitutional wrong is complete before the case begins, then the pros-

ecutor should be treated as a police detective would be in like circumstances: qualified rather than absolute immunity. Prosecutors who break open doors or torture suspects into confessing cause injuries that are complete outside of court, and which the judge cannot diminish (but may be able to compensate). Prosecutors whose out-of-court acts cause injury only to the extent a case proceeds will be brought to heel adequately by the court. *Butz*, 438 U.S. at 515–16, 98 S.Ct. at 2915–16.

Intermediate cases are not hard to imagine. Our own *Burns v. Reed* is one, in which the prosecutor gave legal advice to police who were considering whether to carry out a search. Injuries from illegal searches are felt out of court and without regard to the institution of a prosecution, which cuts against absolute immunity; on the other hand, the availability of prosecutorial advice may reduce the number of illegal searches, and allowing damages on account of bad advice may in the long run increase the number of improper searches. *Burns* will consider where the balance lies. Activities in our case may be put on one or another side of the line with greater confidence.

### B

 Fitzsimmons announced Buckley's indictment to the press on March 9, 1984. According to the complaint Fitzsimmons informed the press about the contents of the indictment and added comments, such as his belief that the bootprint evidence would establish Buckley's guilt and his belief that Buckley was involved in a burglary ring. The district court, following *Stepanian v. Addis*, 699 F.2d 1046 (11th Cir. 1983), and *Marx v. Gumbinner*, 855 F.2d 783 (11th Cir.1988), concluded that Fitzsimmons is not entitled to absolute immunity for these statements, because they took place out of court and because press conferences are not "quasi-judicial" activities.

Whether press conferences are "quasi" something else does not matter. Immunity depends on how announcements could cause injury and on other functional considerations, not on nomenclature. *Imbler* ex-

pressly rejected a submission that the scope of absolute prosecutorial immunity should depend on the extent to which prosecutorial activity is "quasi-judicial". 424 U.S. at 420–21, 96 S.Ct. at 990. We need to know how announcements injure, and where the constitutional wrong lies.

One possibility is that accusations of crime cause infamy. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), holding that the Constitution does not deal with libel or slander by a public official, means that Fitzsimmons' announcement, standing alone, is not actionable under § 1983. Some other injury is essential to create a constitutional wrong. Buckley maintains that the press conference created additional injury because a defendant with a blackened reputation will have trouble obtaining release on bail or a fair trial. The Nicarico murder was front page news throughout northern Illinois. So was the announcement of charges against Buckley, Cruz, and Hernandez; the press has followed the case avidly. By accusing Buckley of being a thief as well as a murderer, and by overstating the value of the bootprint evidence, the prosecutor improperly increased the chances of a conviction, Buckley's argument concludes.

This approach avoids the rock of *Paul* only by falling into the whirlpool of *Imbler*. For if the injury lies in an alteration of the probabilities at trial, the remedy lies in the criminal process rather than in damages litigation. Buckley was entitled to a decision on bail made on the record, as opposed to a decision made on the basis of prejudicial publicity. If the judge denied bail or set it too high, Buckley was entitled to appeal. Similarly, if the press conference poisoned some minds against him, Buckley was still entitled to a voir dire adequate to find unbiased jurors. If such a venire could not be found in DuPage County, Buckley was entitled to a change of venue—or to dismissal of the charges against him. See generally *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6

L.Ed.2d 751 (1961). If the judges who conducted the bail hearing and the trial did their jobs properly, they eliminated any constitutionally impermissible effects of the press conference. If they could not do so, then Buckley was entitled to the best remedy of all: dismissal of the prosecution.

Stating the constitutional wrong as an increase in the probability of an unfair trial demonstrates that absolute immunity applies to the announcement of the indictment. Given *Paul*, there was no (constitutional) injury independent of the indictment and trial. Buckley suffered no constitutional injury unless the judges failed to protect him at trial. This demonstrates that the suit against Fitzsimmons is a disguised attack on either the institution of the prosecution itself, or the decisions of the judges at the bail hearing and trial. Either way, it cannot be the basis of an award of damages.

*Stepanian* and *Marx* hold that prosecutors do not have immunity when announcing indictments. These cases ask whether a press conference is "quasi-judicial", an approach different from *Imbler*'s. Neither *Stepanian* nor *Marx* identifies any constitutional wrong independent of the conduct of the litigation. We therefore respectfully disagree with the eleventh circuit.*

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir.1979), reversed in part on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980), is the only other decision requiring comment. Parts of Judge Swygert's opinion in that case may be understood to say that absolute immunity is never available for pretrial statements. 600 F.2d at 632–33. But Judge Pell did not accept that conclusion, *id.* at 661–62 (dissenting opinion), and Chief Judge Fairchild accepted Judge Swygert's conclusions only to an extent, *id.* at 648 (concurring in Judge Swygert's opinion "except as qualified by the following observations."). Chief Judge Fairchild observed, *id.* at 649,

that *Paul v. Davis* prevents any recovery because of injury to reputation. Judge Swygert's opinion concludes that a prosecutor may be liable for "pretrial prejudice", 600 F.2d at 632, which was left undefined. It may be that he conceived of a species of pretrial detriment outside the ambit of *Paul v. Davis;* at all events none of the opinions in *Hampton* discussed whether immunity is available when the theory is that out-of-court statements led to adverse judicial decisions (denial of release on bail and failure to seat an impartial jury). As this is Buckley's theory, his way to avoid *Paul v. Davis*, we conclude that *Hampton* offers him no support. When pretrial publicity produces constitutional injury only to the extent it influences the course of bail hearings or trial, the prosecutor is absolutely immune from damages.

C

■ Buckley charges Fitzsimmons and two of his assistants, King and Knight, with misconduct during the investigation and presentation of the case to the grand jury. Judge Leinenweber dismissed all of these claims, concluding that absolute immunity covers the entire investigation of a case, meetings with witnesses, presentation to a grand jury, and formulation of a decision to prosecute.

In the main, these conclusions are unexceptionable. Presenting the case to the grand jury, for example, is part of the prosecution proper. The selection of evidence to present to the grand jurors, and the manner of questioning witnesses, can no more be the basis of liability than may the equivalent activities before the petit jury. *Gray v. Bell*, 712 F.2d 490, 502–05 (D.C.Cir.1983); *Lovelace v. Whitney*, 684 F.Supp. 1438, 1442–43 (N.D.Ill.1988), affirmed by unpublished order under the name *Lovelace v. Hall*, 886 F.2d 332 (7th Cir.1989).

■ Conversations between the prosecutors and the bootprint experts similarly

* Because our decision creates a conflict among the circuits, it was circulated before release to all judges in regular active service. See Circuit Rule 40(f). Judges Cudahy and Ripple voted to hear the case in banc. Chief Judge Bauer and Judge Flaum did not participate in the consideration or decision of this case.

may not be the basis of liability. Obtaining assessments from an expert witness, and preparing that witness for trial, causes no injury apart from what happens in court. Obtaining evidence from voluntary suppliers does not violate any of a defendant's rights; only using that evidence could do so. For the reasons we have given, when the injury depends on the costs of the judicial process (including the risk of judicial error), the prosecutor has absolute immunity. Allowing an award of damages on the basis of witness preparation would evade not only the prosecutorial immunity of *Imbler* but also the testimonial immunity of *Briscoe.* These immunities do not give way just because the plaintiff directs his fire against activities preparing for immunized presentations in court. *Heidelberg v. Hammer,* 577 F.2d 429, 432 (7th Cir.1978).

Buckley's allegation that assistant state's attorneys coercively interrogated *him* presents a different problem, however. Such interrogations may inflict injury before the judicial process begins, injury that would be no less if the grand jury declined to return an indictment. If a prosecutor participates in a raid that unconstitutionally invades a suspect's privacy, immunity is qualified rather than absolute. *Hampton v. Hanrahan,* 600 F.2d at 631–33; *Marrero v. Hialeah,* 625 F.2d 499 (5th Cir.1980). For the same reason, if a prosecutor conducts a coercive interrogation, only qualified immunity is available. *Joseph v. Patterson,* 795 F.2d 549, 555 (6th Cir.1986); *Rex v. Teeples,* 753 F.2d 840, 843–44 (10th Cir.1985). To the extent *Myers v. Morris,* 810 F.2d 1437 (8th Cir. 1987), holds that prosecutors are absolutely immune from liability on account of their participation in an unconstitutional interrogation, we respectfully disagree.

Liability is appropriate, however, only when the constitutional violation is complete, and causes injury, out of court. A prosecutor could be liable for depriving a suspect of food and sleep during an interrogation, or beating him with a rubber truncheon, or putting bamboo shoots under his fingernails. A prosecutor could not be mulcted for conducting an interrogation without *Miranda* warnings, because a suspect has no entitlement to the warnings themselves. *Miranda* warnings protect the right to counsel and have no independent stature. Interrogations without *Miranda* warnings thus do not violate a suspect's rights; the violation occurs only when the statements are used in criminal proceedings. *Baxter v. Palmigiano,* 425 U.S. 308, 316–18, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976); cf. *Oregon v. Elstad,* 470 U.S. 298, 305–07, 105 S.Ct. 1285, 1290–92, 84 L.Ed.2d 222 (1985); *Michigan v. Tucker,* 417 U.S. 433, 445–46, 94 S.Ct. 2357, 2364–65, 41 L.Ed.2d 182 (1974). There is likewise no violation in "compelling" a suspect to speak, where the compulsion does not involve practices forbidden on other grounds. The right not to be compelled to testify against oneself is an evidentiary privilege. As the use immunity cases show, the government may require a suspect to speak, so long as it does not use the results against him. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Arguments based on *Miranda* and the self-incrimination clause concern the conduct of the trial and therefore may not be the basis of damages; coercive tactics that are independently wrongful may, however, lead to awards.

It is too early to tell whether Buckley is relying on *Miranda* and the self-incrimination clause, or on the more general right not to be punished (through coercive tactics) in advance of trial. It was accordingly premature to dismiss this aspect of Buckley's complaint. He is entitled to produce evidence, if he has any, tending to show that the prosecutors used tactics adding up to pretrial punishment. Because the injury from such tactics does not depend on the filing of an indictment or the conduct of trial, the prosecutors have no more than qualified immunity.

## IV

Last comes the question whether the three expert witnesses have absolute immunity for their pretrial activities: evaluating the bootprint, writing reports, dis-

cussing the case with prosecutors, and preparing to testify. We agree with the district court that they do. *Briscoe* holds that the presentation of testimony may not be the basis of liability, even if the witness deliberately misleads the court. It would be a hollow immunity if the aggrieved party could turn around and say, in effect: "True, your *delivery* of bad testimony is immunized, but preparing to deliver that testimony is not, so I can litigate the substance of your testimony." Substance is exactly what *Briscoe* puts off limits.

An expert could violate a suspect's rights independently of the litigation. The expert might, for example, break into the suspect's home to obtain samples for analysis. Absolute immunity would not apply to that theft, for the same reason it does not apply to prosecutorial infliction of punishment without trial. A non-testimonial expert could violate a suspect's rights by "cooking" a laboratory report in a way that misleads the testimonial experts. Experts, like the police, "cannot hide behind [the immunity of] the officials whom they have defrauded." *Jones v. Chicago*, 856 F.2d at 994. But nothing in the complaint suggests that the three expert defendants hid evidence, as opposed to misinterpreting it.

Discussions between the prosecutors and the experts violated none of Buckley's rights. Preparing to commit slander or perjury is not actionable. The testimony itself is covered by immunity. Buckley makes it clear that the testimony is the real gravamen of his complaint. Olsen, he submits, "wrongfully changed his initial opinion"; Robbins was an "utterly disreputable witness-for-hire". Maybe so, but cross examination rather than a suit for damages is the right way to establish these things. Junk science is a plague in contemporary litigation, but the peddlers of poorly supported theories do not expose themselves to liability by doing research out of court or appearing in more than one case.

*White v. Frank*, 855 F.2d 956 (2d Cir. 1988), holds that *Briscoe* does not apply to "complaining witnesses". Buckley contends that the three experts are in this category, because but for their opinions the

State's Attorney would not have obtained an indictment. The parallel is not apt. None of the experts invented the report of a crime or brought the fable to the state's attention. Jeanine Nicarico is dead. Each expert was brought into the case by the prosecutors, who sought to evaluate the strength of the evidence against Buckley. We therefore need not decide whether to follow *White*.

To sum up: We decline to accept the appeal on the district court's certification under § 1292(b). DuPage County's appeal, No. 89–2900, is dismissed on the County's motion. Buckley's appeal, No. 89–2899, is dismissed to the extent it seeks relief against DuPage County and Fitzsimmons. We affirm the remainder of the decisions under review on appeal No. 89–2899, with the exception of the contention that the prosecutors engaged in coercive interrogation. The decision is vacated to the extent it dismissed this portion of the complaint, and the case is remanded for further proceedings concerning Fitzsimmons, King, and Knight, consistent with Part III.C of this opinion. On Fitzsimmons' appeal, No. 89–2441, the decision of the district court is reversed, and the case is remanded with directions to dismiss the complaint to the extent it seeks damages on account of the press conference at which Fitzsimmons announced the indictment.

FAIRCHILD, Senior Circuit Judge, dissenting in part and concurring in part:

For the most part, I concur. I, however, have a different view concerning the immunity of prosecutor Fitzsimmons for his alleged creation of prejudicial pretrial publicity. With great respect, I think that Part III, B of the opinion fails to examine the nature of the particular function Fitzsimmons was performing so as to determine whether it presented the public interest needs which justify absolute immunity.

The majority says, "If the injury flows from the initiation or prosecution of the case, then the prosecutor is immune and the defendant must look to the court in which the case pends to protect his interests." This "demarcation" is applied to Mr. Fitzsimmons's press conference state-

ments which are alleged to militate against a fair trial.

The majority leans on the fact that as defendant, Buckley may have been able to protect himself by procedures afforded in the criminal case itself. With all respect, absolute immunity should be recognized only when the purpose of such immunity is served.

In *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court decided to afford the same absolute immunity under section 1983 that the prosecutor enjoys at common law. *Id.* at 427, 96 S.Ct. at 993. The considerations underlying such immunity include "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at 423, 96 S.Ct. at 991. The Court agreed that the prosecutor's activities under consideration "were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." The Court did not consider whether "like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of an advocate." *Id.* at 430–31, 96 S.Ct. at 995 (footnotes omitted).

In the Supreme Court's most recent absolute immunity case, *Forrester v. White,* 484 U.S. 219, 227, 108 S.Ct. 538, 544, 98 L.Ed.2d 555 (1988), the Court considered the scope of judicial immunity and decided that demoting or discharging a probation officer was not a function which entitles a judge to immunity. The Court explained its functional approach saying, "[W]e examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions. Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy...." *Id.* at 224, 108 S.Ct. at 542. The Court did note that court procedures provide safeguards, *id.* at 227, 108 S.Ct. at 544, but it did not present the safeguards as a reason for conferring immunity.

Even in *Butz v. Economou,* 438 U.S. 478, 511–512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978), a case in which the Court extensively discussed judicial procedure as a safeguard, the Court examined the adequacy of the protections only after it determined that the administrative judges and prosecutors whose immunity was at stake were performing the functions that entitle judges and prosecutors in the judicial branch to absolute immunity.

It is true that procedures afforded in our system of justice give a defendant a good chance to avoid such results of prejudicial publicity as excessive bail, difficulty or inability of selecting an impartial jury, and the like. These procedures reduce the cost of impropriety by a prosecutor, but I do not find that the courts have recognized their availability as a sufficient reason for conferring immunity.

Prejudicial pretrial publicity may make it more difficult and more expensive for a defendant to protect the fairness of his trial, and I would recognize that as a constitutional wrong for which damages can be obtained where the prosecutor has acted wrongfully at a stage, such as a press conference, where the purposes to be served by immunity do not apply.

Whether Buckley has sufficiently pled or could prove that Fitzsimmons's statements at the press conference deprived him of constitutional rights seems to me to pertain to the merits, which have not yet been reached.

I would affirm the district court's denial of absolute immunity for Fitzsimmons with respect to his press conference statements.