Elton HOUSTON and Robert
Brown, Plaintiffs,

v.

Cecil PARTEE, et al., Defendants.

No. 90 C 3342.

United States District Court,
N.D. Illinois, E.D.

March 7, 1991.

Confirming Ruling Announced Orally
March 5, 1991.

Thomas Peters, Rick Halprin and Susan Shatz, Chicago, Ill., for plaintiffs.

Jack O'Malley, State's Atty., and Harold E. McKee, III, Asst. State's Atty., Cook County, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Former Cook County State's Attorney Cecil Partee and Assistant State's Attorneys Thomas Dwyer and Larry Wharrie have filed a motion to dismiss the Third Amended Complaint brought against them under 42 U.S.C. § 1983 ("Section 1983") by Elton Houston ("Houston") and Robert Brown ("Brown").[1] Defendants ground their motion on absolute immunity principles, because each of them is sued individually for actions (or inaction) during the period that they were serving as prosecutors. For the reasons stated in this memorandum opinion and order, Defendants' motion is denied.

### Nature of Plaintiffs' Claim

Plaintiffs' Complaint portrays a scenario somewhat different from the more familiar contention that a conviction was obtained with the aid of evidence that was known to the prosecutor to be tainted, so that the prosecutor is sought to be mulcted in damages for that misconduct (the type of situation dealt with in the seminal absolute immunity decision in *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) and in our Court of Appeals' recent explication of *Imbler* in *Buckley v. Fitzsimmons*, 919 F.2d 1230 (7th Cir.1990)). Instead what is charged here is that *after* Houston and Brown were convicted, sentenced and imprisoned—all of which occurred without any alleged impropriety on the part of the prosecutors—Defendants learned of exculpatory evidence that exonerated plaintiffs but failed to disclose that evidence, thus causing plaintiffs to languish in prison for several years.

According to the Complaint (which must of course be taken as true for current purposes), both plaintiffs were convicted of an El Rukn gang-related 1983 shooting

1. After the motion under consideration here was brought, plaintiffs filed (without objection) a Fourth Amended Complaint adding four City of Chicago police officers as defendants. Because no substantive change has been made by that new pleading in the allegations against the present movants, for simplicity this opinion will refer to the most recent version rather than to the Third Amended Complaint as the "Complaint" and will refer to the movants collectively as "Defendants."

murder of Ronnie Bell ("Bell"), based in principal part on questionable identifications by two bystanders. Houston's first jury trial resulted in a mistrial, then Brown's separate bench trial resulted in a conviction and finally Houston's second jury trial led to his conviction too.

In May 1985 a high-ranking member of the El Rukns, Anthony Sumner ("Sumner"), was arrested and became a cooperating witness in the long-term investigation of that organization and its leaders by the offices of the Cook County State's Attorney and the United States Attorney for the Northern District of Illinois. Among the numerous crimes that Sumner disclosed to Assistant State's Attorneys and Chicago police in great detail was the Bell killing, which he described as having been a retaliatory assassination for the prior shooting of an El Rukn. All the details that Sumner gave matched the facts as they were known to the police (and as had been described by the witnesses at Defendants' trials). Most critically, Sumner specifically identified the driver of the car as J.L. Houston (Houston's brother)—something that Houston had claimed all along—and identified the actual killers as two El Rukns, Earl Hawkins and Derrick Kees ("Kees"), and *not* Brown.[2]

Nevertheless neither the Assistant State's Attorneys nor the police officers disclosed the information about Sumner's statements to Houston or Brown or their lawyers.[3] In the face of requests from those lawyers for any information that Sumner had provided about the Bell murder, the Assistant State's Attorneys falsely said that Sumner had provided no evidence favorable to plaintiffs. Indeed, as part of the same coverup the Assistant State's At-

torneys used Sumner as a grand jury witness on numerous occasions, asking him about dozens of other El Rukn crimes (including six to ten other murders) but *never* inquiring about the Bell killing. That deliberate suppression of the truth also included its being withheld from the United States Attorney's Office in its own contemporaneous El Rukn investigation.

But the Assistant State's Attorneys did not stop with that coverup as to Houston and Brown and their lawyers only. Even worse in terms of the lawyers' professional obligations, during the course of plaintiffs' 1986 appeals from their convictions the Assistant State's Attorneys falsely represented *to the Illinois Appellate Courts* that there was nothing to Brown's post-trial claim of newly-discovered exculpatory evidence, even though they knew that his claim was fully corroborated (and more) by the Sumner statements.

That stonewalling continued during 1987 and 1988 despite further requests for information from plaintiffs' counsel. Then in February 1989 Hawkins (who had been a cooperating informant-witness since 1987, providing credible information and testimony as to a number of crimes) actually confessed that the Bell killing had indeed been committed by him along with J.L. Houston and Kees—and *not* by plaintiffs. Both J.L. Houston and Kees (each of whom was in prison) then admitted their own guilt and gave detailed accounts of the killing.

Even then Defendants said nothing, continuing to suppress the Sumner statement and the three confessions. It was only after plaintiffs' counsel had obtained some information from other sources and had confronted the Assistant State's Attorneys

---

**2.** By a kind of bizarre coincidence, this opinion has been dictated and transcribed even while the jury is deliberating its verdict in a criminal trial conducted before this Court—one involving the potential imposition of a death penalty—in which one critical government witness was Kees, who acknowledged that during the several years surrounding and including 1983 he had in fact been a "General" in, and a professional killer for, the El Rukns (which had a paramilitary organizational structure). In dealing with one of the motions in that trial, this Court was required to read Kees' grand jury testimony in

another case, in which Kees did indeed specifically admit the Bell killing among others and identified J.L. Houston (not the plaintiff in this case) and Earl Hawkins as the others involved in the Bell murder.

**3.** Partee did not become State's Attorney until some years later, in the spring of 1989. Plaintiffs charge him with the concealment of their known innocence for the few months between the time he took office and the date of plaintiffs' release from prison.

with it that Defendants came clean. In the meantime, Houston and Brown had served four years in prison for the crime that they did not commit and as to which Defendants had known of their innocence soon after their convictions.

## Absolute Immunity

*Imbler* teaches that the social gains that are promoted by the need for fearless and uninhibited prosecutorial action outweigh the protection of constitutional rights under Section 1983, so that even active prosecutor misconduct in obtaining a conviction—even such a thing as suborning perjury—is insulated from suit. And *Buckley*, 919 F.2d at 1241–42 (citation omitted), quoted in part at Defendants' Mem. [8],[4] locates the watershed for separating unprotected conduct by a prosecutor from conduct covered by the mantle of absolute immunity:

> All of this suggests a simple demarcation. If the injury flows from the initiation or prosecution of the case, then the prosecutor is immune and the defendant must look to the court in which the case pends to protect his interests. If, however, a constitutional wrong is complete before the case begins, then the prosecutor should be treated as a police detective would be in like circumstances: qualified rather than absolute immunity. Prosecutors who break open doors or torture suspects into confessing cause injuries that are complete outside of court, and which the judge cannot diminish (but may be able to compensate). Prosecutors whose out-of-court acts cause injury only to the extent a case proceeds will be brought to heel adequately by the court.

Defendants seek to wrap themselves in that protective mantle. They do not acknowledge—most likely they do not even recognize—the irony of what their Mem. [5–6] quotes from *Imbler*, 424 U.S. at 427, 96 S.Ct. at 993 (citation omitted):

The ultimate fairness of the operation of the system itself could be weakened by subjecting prosecutors to § 1983 liability. Various post-trial procedures are available to determine whether an accused has received a fair trial. These procedures include the remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies. In all of these the attention of the reviewing judge or tribunal is focused primarily on whether there was a fair trial under law. This focus should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment.

And that same irony is underscored by the language quoted from *Buckley* in the preceding paragraph.

Under the express language (as well as the underlying policy) reflected in those and other statements from *Imbler* or *Buckley*, there is nothing to support immunity in the situation presented here. Holding a prosecutor responsible for such active suppression of exculpatory (or even worse, fully exonerating) evidence *after* a defendant has been convicted poses no threat whatever to the values identified in those cases— to what *Imbler*, 409 U.S. at 427 n. 25, 96 S.Ct. at 993 n. 25 (the footnote to the language quoted earlier in this opinion) spoke of in these terms:

> The possibility of personal liability also could dampen the prosecutor's exercise of his duty to bring to the attention of the court or of proper officials all significant evidence suggestive of innocence or mitigation. At trial this duty is enforced by the requirements of due process, but after a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts

---

**4.** In one of life's petty annoyances, Defendants' counsel has thoughtlessly failed to number the pages of his memorandum, so that this Court has had to do so. That seems to be a growing fashion, encountered by this Court in perhaps a half-dozen filings within the past several months. Is it that such lawyers don't anticipate being quoted or cited—or perhaps that they subconsciously don't *want* to be called to account for what they have said? In any event, the memorandum pages are indicated by brackets.

doubt upon the correctness of the conviction. Cf. ABA Code of Professional Responsibility § EC 7-13 (1969); ABA, Standards, *supra*, § 3.11.

Indeed, quite the contrary is true: That express *Imbler–Buckley* reliance on the *courts* to protect the rights of the unjustly convicted defendant is directly subverted by the prosecutor who knowingly and actively withholds subsequently-learned material evidence that would enable the courts to right the wrong of the unjust conviction—and as alleged in this case, by the prosecutor who actively misrepresents those later-learned facts to the courts. Defendants would turn *Imbler* on its head by invoking their ethical obligations, as described in the language quoted in the preceding paragraph, to insulate themselves against liability for a deliberate violation of those very obligations.

#### Conclusion

Accordingly this Court holds that Defendants are not absolutely immune from Section 1983 liability for their suppression of exonerating evidence that they first learn of post-conviction but that they then wilfully withhold from both defense counsel and the post-conviction courts. Defendants' motion is denied, and they are ordered to answer the Complaint on or before March 19, 1991.