118 F.3d 1157
 37 Fed.R.Serv.3d 1148
 LAWYERS TITLE INSURANCE CORP., on its own behalf and as
subrogee to certain claimants, Plaintiff-Appellee,
v.
DEARBORN TITLE CORP., et al., Defendants,
and
United Financial Mortgage Corp., Garnishee-Defendant-Appellant.
 No. 96-3820.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 15, 1997.
Decided July 1, 1997.
 
 Steven P. Handler, William P. Schuman (argued), Scott Martin, Corey Rubenstein, McDermott, Will & Emery, Chicago, IL, for Plaintiff-Appellee.
 Rhonda Rene Pengra, Constantine L. Trela, Jr., (argued), Sidley & Austin, Ronald P. Kane, Michael A. Kraft, Gomberg, Kane & Fischer, Chicago, IL, for Garnishee-Defendant-Appellant.
 Before POSNER, Chief Judge, and BAUER and RIPPLE, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 This appeal from a judgment for the plaintiff in a diversity suit governed by Illinois law presents difficult questions concerning appellate jurisdiction, the common law of restitution, and statutes of limitations. Lawyers Title, the plaintiff, is a title insurer. Dearborn Title, now defunct and, it appears, assetless, was an escrow and closing agent and also served as Lawyers' agent for the issuance of title insurance policies in Illinois. Lawyers Title sued Dearborn to recover money that Lawyers had paid to its insureds who had incurred losses as a result of Dearborn's mishandling of real estate transactions involving those insureds. After getting a default judgment for $5.9 million against Dearborn, Lawyers Title filed supplemental proceedings under Fed.R.Civ.P. 69(a) against United Financial Mortgage Corporation, claiming that Dearborn had paid United--a mortgage lender that was Dearborn's biggest customer--some $654,000 by mistake, and alternatively that the payment of this money was a fraudulent conveyance. As Dearborn's judgment creditor, Lawyers Title is entitled to recover this money from United if Dearborn would have been entitled to do so. 735 ILCS 5/2-1402(c)(3); Bentley v. Glenn Shipley Enterprises, Inc., 248 Ill.App.3d 647, 189 Ill.Dec. 115, 118, 619 N.E.2d 816, 819 (1993).
 
 
 2
 The district judge granted summary judgment for Lawyers Title (without, however, addressing Lawyers' alternative ground--fraudulent conveyance) for all but $70,000 of the money it sought, reserving that claim for trial and entering judgment under Fed.R.Civ.P. 54(b) for the balance so that United could appeal immediately. 939 F.Supp. 611 (N.D.Ill.1996). The judge was empowered to do this only if Lawyers' claim for the recovery of the $70,000 is a separate claim from the claims she allowed. Whether it is or not is a difficult question but one that cannot be discussed intelligibly until we have set forth the facts and contentions presented in the appeal.
 
 
 3
 United Financial is a middleman in the mortgage loan market. It makes the loan to the mortgagor and then sells the loan to a bank or other financial institution. It used Dearborn as follows: United would deposit the money for the loan with Dearborn, which would place the money in an escrow account, handle the closing, and upon its completion disburse the money in the account to the mortgagor, refinancing bank, or seller, depending on the nature of the loan. Lawyers Title had insured the borrower's title in some of these transactions, and so in effect had insured some of the funds deposited in Dearborn's escrow accounts. That is why it incurred losses when Dearborn lost, or more likely stole, the funds. So far as appears, United Financial did not lose any of its own money that had been deposited in Dearborn's escrow accounts.
 
 
 4
 The judgment that United Financial is appealing from is based on two checks that Dearborn gave United. One, for $87,800, was to reimburse United for advancing funds to Dearborn for transfer to a couple named Larios who were refinancing a mortgage loan they had gotten from United. United had never advanced those funds, so there was nothing for Dearborn to reimburse. Therefore, under the most elementary principles of restitution, Dearborn--and so Lawyers Title standing in its shoes--was entitled, at least prima facie, to the return of the $87,800, the money having been paid to United on the mistaken assumption that it was to reimburse United for the advance of a like sum to Dearborn. Allstate Life Ins. Co. v. Yurgil, 259 Ill.App.3d 375, 198 Ill.Dec. 223, 226, 632 N.E.2d 282, 285 (1994); Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406, 1414 (7th Cir.1995); Restatement of Restitution § 18 (1937). We do not understand United to be contesting Lawyers' prima facie entitlement to this money. But it seeks to retain it by way of setoff, for we shall see in a moment that United claims that Dearborn may have owed it more than $654,000.
 
 
 5
 The other check that Dearborn gave United was for $566,000. If that was money that Dearborn owed United, then United is entitled to keep it; for this is not a preference suit, which would be a suit brought by a trustee in bankruptcy. 11 U.S.C. § 547(b). Dearborn did not declare bankruptcy within 90 days after the check was honored, and there is no suggestion that United or any of its principals could be characterized as "insiders" of Dearborn within the meaning of 11 U.S.C. § 547(b)(4)(B), which allows more time for setting aside preferences for insiders. Indeed, so far as we can determine, Dearborn has never filed for bankruptcy, though it is unquestionably insolvent.
 
 
 6
 The check was not drawn in response to a bill or series of bills or any other written demand by United for payment. Extensive discovery turned up no bookkeeping entry or other documentation of debts owed United by Dearborn. Although the check was deposited in United's corporate account and cleared, the receipt of the money was nowhere recorded in United's books of account. Despite its rather grand name, United Financial Mortgage Corporation was a small company when these payments were made; and its principal, Khoshabe, claims to be a lousy bookkeeper. Dearborn's principal, Rasulis, is under criminal investigation and took the Fifth Amendment when asked to explain the basis for this large payment to United.
 
 
 7
 The irregular way in which United accounted for the check, coupled with the fact that Dearborn went belly-up several months after the check was issued, and with the halo of fraud that surrounds Rasulis and the lack of any documentation of a debt, creates an almost irresistible inference that Rasulis and Khoshabe conspired to defraud Dearborn's other creditors and the Internal Revenue Service, and that the two checks were a fraudulent conveyance by Dearborn to United. An issue critical to both of Lawyers Title's theories of liability, however (payment by mistake and fraudulent conveyance), is whether, despite appearances, the check for $566,000 discharged a liability of Dearborn to United and thus was neither mistaken nor unsupported by consideration. (The other check, the one for $87,800, was clearly paid by mistake if it was not a fraudulent conveyance.) United argues that the check was, in fact, in discharge of three distinct types of liability:
 
 
 8
 First, Khoshabe testified in his deposition that Dearborn had made an oral contract with United to pay a penalty, for every check that it gave United that bounced, equal to the face amount of the check, and that the total amount due United under this oral contract might have reached $300,000. Second, Dearborn had, again according to Khoshabe, agreed to pay United a rental fee for every closing that took place at United's offices. The fee was $100 if the mortgage lender was not United, $300 if it was. The maximum due United under this "contract" was $210,000. We are still short of $566,000, but Khoshabe testified, in the third place, that Dearborn was also liable to United in tort for costs imposed upon United by Dearborn's delays in closing United's loans, delays that sometimes thwarted advantageous sales of the loans. Khoshabe thinks that the total costs of these delays may have been as much as $140,000, in which event Dearborn owed United far more than the $566,000 that it had paid United with the second check.
 
 
 9
 Lawyers Title argues that neither the bounced-check penalty nor the extra rental fees when United was the lender were lawful, and therefore neither item represented a real debt. Illinois like all other states does not enforce penalty clauses in contracts. (For a global perspective, see Ugo Mattei, "The Comparative Law and Economics of Penalty Clauses in Contracts," 43 Am. J. Comp. L. 427 (1995).) Parties to a contract can agree on the amount of damages if there is a breach, but for such a "liquidated damages" clause to be enforceable it must be a reasonable estimate of what the promisee's losses are likely to be in the event of a breach. Bauer v. Sawyer, 8 Ill.2d 351, 134 N.E.2d 329, 333 (1956); Saunders v. Michigan Ave. Nat'l Bank, 278 Ill.App.3d 307, 214 Ill.Dec. 1036, 662 N.E.2d 602, 609 (Ill.App.1996); Lake River Corp. v. Carborundum Co., 769 F.2d 1284, 1289-90 (7th Cir.1985); 3 E. Allan Farnsworth, Farnsworth on Contracts § 12.18, pp. 283-84 (1990). This rule has come in for a lot of academic criticism, running along the following lines. A penalty clause has no effect on anyone except the parties, so why should a court refuse to enforce it, unless there is evidence of fraud or other overreaching not here argued? Penalty clauses can serve a valuable signaling device: by agreeing to a penalty Dearborn manifested a credible determination to break itself of what had become a bad habit of paying its debts to United with checks that bounced. A penalty clause makes particularly good economic sense if there is some probability that a breach will go undetected--for example, if the seller could plausibly blame the buyer for the failure of the seller's product to perform as intended. In such a case, without a penalty clause the seller's expected damages liability will be less than the buyer's actual damages and there will be too many breaches from the standpoint of economic efficiency. It can even be argued that a penalty clause is unlikely to overcompensate the promisee if an ex ante (before the fact) perspective is employed, because the promisor would not agree to such a clause unless it was necessary to compensate the promisee for an expected loss. As for any concern that penalty clauses might discourage efficient breaches--breaches in which the profit from the breach exceeds the cost to the promisee--the promisee can always waive the penalty and will do so if compensated by the promisor. The compensation doesn't have to equal the penalty, since if the promisee refuses to waive its rights under the contract and as a result the promisor adheres to the contract, the promisee will not receive the penalty because there will be no breach.
 
 
 10
 Against all this it can be argued that penalty clauses, precisely by encouraging the formation of contracts likely to be broken--which presumably is why a promisee would demand such a clause--would, if enforceable, throw more contract cases into the courts. Such a clause might also make the promisee, who may profit greatly from the promisor's breach since it will activate the promisee's entitlement to a penalty, stubborn about agreeing to contract modifications when the promisor gets into trouble. A related point is that penalty clauses turn minor breaches of contract into litigation casus belli by increasing the expected judgment in a breach of contract suit. The parties to lawsuits do not pay the full costs that litigation imposes on the judicial system, and so courts are justly concerned with proposed changes in law that would foster additional litigation.
 
 
 11
 But the academic debate over penalty clauses, interesting as it is, is irrelevant in the here and now. The law is clear that penalty clauses are unenforceable, and so we must consider whether the 100 percent penalty for bounced checks can be viewed as liquidated damages, that is, as a bona fide estimate of the likely damages to United if Dearborn bounced a check.
 
 
 12
 Clearly not. A simple example will show why. If Dearborn bounced a check to United for $150,000 and one day later replaced it with a check that cleared, United would be entitled to claim "damages" of $150,000. Yet its only loss would be one day's interest on $150,000, which at an interest rate of 10 percent a year would be less than $50. United is right to point out that depositing bounced checks could imperil its relations with its bankers, who might wonder what quality of people or firms United was dealing with. Such a harm--a loss of "good will," more concretely a diminution of future contractual opportunities--would be difficult to quantify, making a provision for liquidated damages highly appropriate. Bauer v. Sawyer, supra, 134 N.E.2d at 333. But the harm is largely independent of the amount of the check that is bounced, and the sanction seems in any event highly disproportionate to any reasonable estimate of the harm, as our numerical example showed.
 
 
 13
 Even though the sanction is clearly excessive ex ante, that is, in reference to the full range of likely breaches, it might be redeemed if the particular breach for which the penalty was sought was so calamitous that the penalty was a happily reasonable estimate of compensatory damages for that breach, though not in general. 3 Farnsworth, supra, § 12.18, p. 293. But there is no indication of that here. So unlikely is it that the sanction could be justified as a form of liquidated damages that United had to produce some evidence of its reasonableness to create a triable issue. It produced none.
 
 
 14
 The Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§ 2601 et seq., forbids the payment of a kickback for referring to the payor an opportunity to provide a real estate settlement service for a federally related mortgage loan. 12 U.S.C. § 2607(a). The district court found that the $200 premium that United received from Dearborn for letting Dearborn use United's premises to close mortgage loans originated by United was such a kickback, the loans being "federally related." (Or so at least the parties assume, without discussion. The criteria are set forth in 12 U.S.C. § 2602(1). We need not decide whether they were satisfied or not; we treat the parties' silence as a stipulation that they were satisfied.) The cost of renting office space to Dearborn for conducting mortgage closings was no greater when United was the lender than when some other financial institution was. The only plausible explanation for the $200 premium is that it was compensation to United for steering its borrowers to Dearborn to handle the closing. There may conceivably be a legitimate explanation; maybe Dearborn had to charge less for its closing services to other customers because they did not trust it as much as United's customers did. But as with the penalty issue, the condition for the transaction to have been lawful (that the lower price was not due to the fact that there was no kickback when United was not the originator of the loan) is so unlikely to have been met that a burden of explanation lay on United, which in its submissions to the district court offered no explanation whatsoever. The only possible inference on this record is that the $200 was indeed a kickback.
 
 
 15
 But part of the claimed debt was for the $100, a part of the total rental fee that Lawyers Title does not claim was a kickback; and it is this part, multiplied by the number of closings for which United claims it was not paid, that generated the $70,000 that the district judge carved out as a separate claim for trial. We must consider whether it is indeed a separate claim, for if not we lack jurisdiction over this appeal, since the judgment appealed from is final only by virtue of Rule 54(b) of the Federal Rules of Civil Procedure. The test for separate claims under the rule is whether the claim that is contended to be separate so overlaps the claim or claims that have been retained for trial that if the latter were to give rise to a separate appeal at the end of the case the court would have to go over the same ground that it had covered in the first appeal. Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 8, 100 S.Ct. 1460, 1464-65, 64 L.Ed.2d 1 (1980); NAACP v. American Family Mutual Ins. Co., 978 F.2d 287, 292 (7th Cir.1992); Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1366-68 (7th Cir.1990); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 580 (1st Cir.1994). It is to avoid such duplication that the power of the district judge to enter an appealable judgment under Rule 54(b) is limited to separate claims--or to separate parties whether or not their claims are separate, Walker v. Maccabees Mutual Life Ins. Co., 753 F.2d 599, 601 (7th Cir.1985); United States v. Ettrick Wood Products, Inc., 916 F.2d 1211, 1217 (7th Cir.1990) (per curiam); 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2656, pp. 47-48 (2d ed.1983), though for a different reason: to minimize uncertainty about who is in and who is out of the case. National Metalcrafters v. McNeil, 784 F.2d 817, 821 (7th Cir.1986).
 
 
 16
 The question whether the retained and appealed claims are separate is a close one in this case, since Lawyers Title's claim for the return of the $70,000 involves the same check as the claim on which the district judge entered the Rule 54(b) judgment. But the actual overlap is slight. The only issue with respect to the $100 component of the rental fee is whether there was a contract to pay such a fee (or at least an expectation of payment and some value to the service, supporting a claim for restitution) or whether it is a fabrication of Khoshabe's. That is not an issue in the present appeal, because while Lawyers does not concede that there was any such contract it acknowledges that whether there was or not is a triable issue, not one that can be resolved on summary judgment; hence it concedes the existence of the contract for the purposes of this appeal, so eliminating the issue from the appeal. Not only are the issues different, but--the important thing--the facts pertaining to them are different. We emphasized in Olympia Hotels Corp. v. Johnson Wax Development Corp., supra, 908 F.2d at 1368, that some overlap between the facts in the retained and the appealed claims is not fatal. Here the overlap is limited to the bare bones of the relationship between Dearborn and United--these bare bones constituting the background to the contract dispute retained by the district court. Should the claim for the $70,000 result in another appeal to us, we won't have to go over much of the same ground covered in the present appeal.
 
 
 17
 This is not a case in which the facts underlying the retained and the appealed claims are the same, and the only difference is the legal theory underlying the claims. NAACP v. American Family Mutual Ins. Co., supra, 978 F.2d at 292; Buckley v. Fitzsimmons, 919 F.2d 1230, 1237 (7th Cir.1990), vacated on other grounds, 502 U.S. 801, 112 S.Ct. 40, 116 L.Ed.2d 19 (1991); Horn v. Transcon Lines, Inc., 898 F.2d 589, 593 (7th Cir.1990). So it is not as if Lawyers Title (as Dearborn's surrogate) were seeking the return of the $300 closing fee on the alternative grounds that there was no contract but if there was then $200 of the fee paid pursuant to the contract was an illegal kickback. It is seeking the return of the $100 on the basis of the absence of a contract, and $200 on the ground that this part of the fee was a kickback. Nor is it like a case in which the plaintiff sustains two injuries arising out of the same accident and seeks to appeal from the denial of damages for one of them. The facts surrounding the accident would be common to both injuries, and the plaintiff's damages would not be perfectly divisible between the two injuries; so if there were separate appeals, the appellate court would in the second appeal be revisiting much of the ground covered in the first.
 
 
 18
 Lawyers Title is naturally eager to recover what it considers its money from United; to allow the resolution of the proceeding to be delayed indefinitely because a small separate claim remains to be resolved would be to allow the tail to wag the dog. If the tail, even if very short, is firmly enough attached to the dog then Rule 54(b) may not be used to accelerate the appeal. But it is not here, given how limited the overlap is between the facts underlying the claims.
 
 
 19
 So we have appellate jurisdiction and return to the merits, where the most important question is whether, given that Dearborn had no legally recognized debt to United arising out of either the penalty contract or the kickback contract, Lawyers Title, as Dearborn's surrogate, can get back the money that Dearborn paid to discharge these "debts." One obstacle to this claim is the distinction that some old cases, which United would like us to resurrect, make between payment under mistake of fact (as with the Larios transaction--the $87,800 check--where as we said Lawyers' prima facie claim for restitution is secure) and payment under mistake of law. See 2 Dan B. Dobbs, Law of Remedies: Damages-Equity-Restitution § 11.2, pp. 715-16 (2d ed.1993); 2 Farnsworth, supra, § 9.2, p. 503. If the facts are construed as favorably to United as the record permits, Dearborn was under no misapprehension concerning the facts when it paid $566,000 to United. It just failed to realize that it did not owe anywhere near as much because the bounced-check penalty was unenforceable under contract law and the kickback agreement illegal and so also unenforceable. Granted, it is unlikely that Dearborn actually made any mistake. It is more likely that Rasulis "parked" this money with Khoshabe's firm and that the money--which, remember, never showed up on the books of United--was later split between the two of them. But of course Khoshabe does not admit this, and so it is proper for Lawyers Title to base its argument on the premise that so much of the money as Dearborn paid United in respect of the penalty clause and excess rental fees was paid by mistake.
 
 
 20
 The cases that refuse to order the restitution of money paid under a mistake of law say that everyone is assumed to know the law, so the plaintiff has only himself to blame for the mistake. Yates v. Royal Ins. Co., 200 Ill. 202, 65 N.E. 726, 727 (1902); 2 Farnsworth, supra, § 9.2, p. 503. A more sophisticated rationale is that when someone pays a claim to which he might have a good defense, he is in essence settling a legal dispute, and he should not be able to undo the settlement by suing on the ground that he has the better of the dispute. Restatement, supra, § 45, comment a; 2 Dobbs, supra, § 11.17, p. 759. The first justification for refusing restitution in cases of mistake of law is rather wooden. In a complex modern society it is not possible for everyone to know every nook and cranny of the civil laws that bear on his activities (criminal law is more intuitive--and where it is not, proof of knowledge of the illegality of the act is often required). The second justification fails when the dispute is so one-sided that the inference of a settlement is completely implausible--in other words when it is apparent that the "debt" had no legal basis.
 
 
 21
 These may seem fuzzy grounds for allowing recovery in mistake of law situations; and there are cases in which the mistake of law really is culpable and restitution should be barred because the defendant relied on the plaintiff's payment of the money. See, e.g., 3 George E. Palmer, The Law of Restitution § 14.27, p. 338 (1978). But to reach that result, and to prevent parties to settlements from trying to rescind by crying mistake, does not require a rule that mistakes of law can never be grounds for restitution. Reliance isn't argued here--nor had United even a colorable claim to bounced-check "penalties"--making this a case in which the defendant claims a right to keep money to which he has neither legal nor equitable entitlement. A number of Illinois cases allow restitution in such a case, notwithstanding the plaintiff's mistake of law. Harrison Sheet Steel Co. v. Lyons, 15 Ill.2d 532, 155 N.E.2d 595, 597-98 (1959); Drury v. County of McLean, 92 Ill.App.3d 83, 47 Ill.Dec. 214, 216-17 414 N.E.2d 1330, 1332-33 (1980), rev'd on other grounds, 89 Ill.2d 417, 60 Ill.Dec. 624, 433 N.E.2d 666 (1982); Johnston v. City of Bloomington, 61 Ill.App.3d 209, 18 Ill.Dec. 538, 377 N.E.2d 1174, 1177-78 (1978), rev'd on other grounds, 77 Ill.2d 108, 32 Ill.Dec. 319, 395 N.E.2d 549 (1979). Harrison, a decision by Illinois' highest court, is explicit that restitution is permissible in mistake of law cases, 155 N.E.2d at 597-98, and while another decision by that court, Commercial Nat'l Bank v. Bruno, 75 Ill.2d 343, 27 Ill.Dec. 351, 389 N.E.2d 163 (1979) (not cited by United, however), looks the other way, it is distinguishable. The administrator of an estate was trying to get back money that he had distributed to some of the heirs, having mistakenly overlooked the rights of other heirs; the mistake was not only negligent, see id. 27 Ill.Dec. at 355, 389 N.E.2d at 167, but indeed bordered on the inexplicable.
 
 
 22
 Other Illinois cases also not cited by United hold that a voluntary payment made under a claim of right cannot be recovered by showing that the payment was not required by law. E.g., Kanter & Eisenberg v. Madison Associates, 116 Ill.2d 506, 108 Ill.Dec. 476, 478, 508 N.E.2d 1053, 1055 (1987); Freund v. Avis Rent-A-Car System, Inc., 114 Ill.2d 73, 101 Ill.Dec. 885, 887, 499 N.E.2d 473, 475 (Ill.1986); Smith v. Prime Cable, 276 Ill.App.3d 843, 213 Ill.Dec. 304, 308-09, 658 N.E.2d 1325, 1329-30 (1995); WH Smith Hotel Services, Inc. v. Wendy's Int'l, Inc., 25 F.3d 422, 428 (7th Cir.1994) (applying Illinois law). These cases merely stand for the principle to which we have already alluded that in general you cannot rescind your acceptance or settlement of a claim after it has become final merely by arguing that the claim was no good after all. Professor Palmer does point out that Illinois has been slower than other states to allow the reformation of contracts on the basis of a mistake of law. 3 Palmer, supra, § 13.3, p. 14. But reformation is an equitable remedy, whereas here restitution is being sought in an action at law for unjust enrichment, see generally 1 Dobbs, supra, § 4.2, and is therefore a legal remedy, Reich v. Continental Casualty Co., 33 F.3d 754, 755-56 (7th Cir.1994), and courts are traditionally more chary about providing equitable than legal relief. See Page v. Bloom, 223 Ill.App.3d 18, 165 Ill.Dec. 379, 382, 584 N.E.2d 813, 816 (1991); ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc., 90 Ill.App.3d 817, 46 Ill.Dec. 186, 198, 413 N.E.2d 1299, 1311 (1980); Hoover v. Wagner, 47 F.3d 845, 850 (7th Cir.1995). Dobbs points out that "there is now very little authority for the mistake of law rule in the form of actual decisions rejecting restitution. On the contrary, statutes, the Restatement, and most contemporary cases now treat mistakes of law as mistakes of fact." 2 Dobbs, supra, § 11.2, p. 716 (footnotes omitted).
 
 
 23
 Given the virtual disappearance of the distinction in the law of restitution between mistake of fact and mistake of law and the square precedent of the Harrison decision, we have little doubt that Illinois' highest court would allow restitution in a case such as the present--but only insofar as the bounced-check penalty is concerned. The picture is much more blurry with respect to the kickbacks, though not because there was any colorable basis for their payment in the first place; there was not, so the defense of voluntary payment under a claim of right is not available to United. But other defenses to Lawyers' claim for the recovery of the kickbacks as having been paid under a mistake of law may be available. It is one thing to say that even a business firm shouldn't necessarily be charged with knowledge of every law that might impinge upon its business; it is another to say that a firm in the real estate settlement services business, such as Dearborn, can be excused for not knowing about the Real Estate Settlement Procedures Act. Such a firm would be totally irresponsible, and so would not have an appealing claim to recoup the kickbacks--unless compliance with the Act would be more likely if anyone who paid kickbacks could get them back, since this would make the extraction of kickbacks, in violation of the Act, a less profitable undertaking. As between Dearborn and United, United was the more culpable in soliciting and accepting what amounted to bribes to throw business Dearborn's way. So there is an argument for punishing United more severely by making it give the money back. The fact that the money will be received not by a merely less guilty party, Dearborn, but by a totally innocent party, Lawyers Title, strengthens the argument for restitution. Dearborn may have been in pari delicto with United, though we think not, for the reason just stated; Lawyers Title certainly was not. Scholes v. Lehmann, 56 F.3d 750, 754-55 (7th Cir.1995).
 
 
 24
 Even so, United argues that Lawyers Title is barred from recovering the kickbacks by the one-year statute of limitations in the Real Estate Settlement Procedures Act. 12 U.S.C. § 2614. True, this is not a suit under that Act, but instead a common law suit for restitution, based on the argument that the kickbacks were made pursuant to a contract that, being illegal, created no true debt. The suit was brought within the limitations period for suits of that kind, which is five years. 735 ILCS 5/13-205 (catch-all provision for civil actions not otherwise provided for); cf. Armstrong v. Guigler, 174 Ill.2d 281, 220 Ill.Dec. 378, 383, 673 N.E.2d 290, 295 (1996). Still, the basis of the suit is the Act; there is no suggestion that anything else made these kickbacks illegal; and if the limitations period that a statute prescribes for the recovery of money paid in violation of the statute could be avoided by characterizing the suit as one for restitution of money paid under a mistake of law, statutes of limitations would have no bite in a large class of cases. Buyers of automobiles or other consumer durables on credit could, without regard to the statute of limitations in the Truth in Lending Act, seek restitution of finance charges alleged to have been collected by their sellers in violation of the Act's intricate prohibitions.
 
 
 25
 Granted, there is a question whether the Real Estate Settlement Procedures Act confers any rights on the payor of the kickback, as opposed to the customers for the real estate settlement service. See 12 U.S.C. § 2607(b). We do not understand either party to be contesting the point, so we let it pass. If the Act does not apply, Lawyers Title is nowhere, for, as we have just said, there is no other basis for holding the kickbacks illegal.
 
 
 26
 We conclude that the Act's one-year statute of limitations does apply to this suit, at least insofar as the suit seeks restitution of the kickbacks. Cf. Meghrig v. KFC Western, Inc., --- U.S. ----, ----, ----, 116 S.Ct. 1251, 1254, 1255, 134 L.Ed.2d 121 (1996); United States v. Dalm, 494 U.S. 596, 602-08, 110 S.Ct. 1361, 1365-68, 108 L.Ed.2d 548 (1990); Roseville Plaza Limited Partnership v. United States Gypsum Co., 811 F.Supp. 1200, 1210-11 (E.D.Mich.1992), aff'd, 31 F.3d 397 (6th Cir.1994); Alex J. Grant, Note, "When Does the Clock Start Ticking?: Applying the Statute of Limitations in Asbestos Property Damage Actions," 80 Cornell L.Rev. 695, 721 (1995). Insofar as it seeks to set aside a fraudulent conveyance, it is not merely a recharacterization of a suit under the statute for the recovery of kickbacks. But the parties have not discussed what limitations period is applicable to Lawyers' claim of fraudulent conveyance, though it would probably be four years. 740 ILCS 160/10.
 
 
 27
 Lawyers Title argues that even if the one-year statute of limitations is applicable, it was tolled by United's fraudulently concealing the fact that it had received money from Dearborn to which it was not entitled. The facts bearing on this issue are undeveloped, because the district judge did not think the one-year statute of limitations applicable; but there is a threshold legal question whether tolling is possible. It is not if the one-year period is jurisdictional, Cada v. Baxter Healthcare Corp., 920 F.2d 446, 451 (7th Cir.1990), that is, if Congress did not want anyone to be allowed to recover a real estate settlement kickback more than a year after it was paid. The practical meaning of a jurisdictional limitation is that the court must enforce it regardless of any agreement between or conduct by the parties; it is not only for their protection. Statutes of limitations are ordinarily for the protection of defendants and so can be waived or forfeited by them; but they also protect the courts from the burden of adjudicating old claims. United States v. Kubrick, 444 U.S. 111, 117, 100 S.Ct. 352, 356-57, 62 L.Ed.2d 259 (1979); Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945); Higgins v. New York Stock Exchange, 942 F.2d 829, 834 (2d Cir.1991); Restatement (Second) of Conflict of Laws § 142, comment d (1971). If the second goal were paramount, the period of limitations would not be within the defendant's power to waive. But we cannot find any case that holds a federal statute of limitations jurisdictional on this ground. With one exception to be noted, courts hold federal statutes of limitations to be jurisdictional only when the United States is a defendant--that is, out of regard for the defendant (and in keeping with the general reluctance of courts to estop the government to assert its statutory rights) rather than out of regard for the courts or for the social interest in burying old claims. See Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990) ("time requirements in lawsuits between private litigants are customarily subject to 'equitable tolling' "). As we said in Central States, Southeast & Southwest Areas Pension Fund v. Navco, 3 F.3d 167, 173 (7th Cir.1993), "periods of limitations in federal statutes ... are universally regarded as nonjurisdictional.... Only rules limiting the commencement of actions against the United States have been given the 'jurisdictional' treatment, on account of sovereign immunity." States are more prone to treat their statutes of limitations as jurisdictional, see, e.g., Padie v. Alaska, 557 P.2d 1138, 1140 (Alaska 1976); Travelers Indemnity Co. v. Rubin, 209 Conn. 437, 551 A.2d 1220, 1225 (1988); Faulkner-King v. Department of Human Rights, 225 Ill.App.3d 784, 167 Ill.Dec. 330, 335, 587 N.E.2d 599, 604 (1992); People v. Bell, 45 Cal.App.4th 1030, 53 Cal.Rptr.2d 156, 177 (1996), and one of our sister circuits has held that federal statutes of limitations are jurisdictional in criminal cases, United States v. Cooper, 956 F.2d 960, 961-62 (10th Cir.1992)--but the other circuits, including our own, disagree. United States v. Meeker, 701 F.2d 685, 687 (7th Cir.1983); United States v. Wilson, 26 F.3d 142, 155 (D.C.Cir.1994); Acevedo-Ramos v. United States, 961 F.2d 305, 307 (1st Cir.1992).
 
 
 28
 Of particular relevance are the decisions which hold that the statute of limitations in the Truth in Lending Act is not jurisdictional even though the limitations period is found in the same section as the provision conferring jurisdiction on the federal courts to enforce the Act, King v. California, 784 F.2d 910, 914-15 (9th Cir.1986); Jones v. TransOhio Savings Ass'n, 747 F.2d 1037, 1039-43 (6th Cir.1984)--the principal ground on which the District of Columbia Circuit has held that the one-year statute of limitations in the Real Estate Settlement Procedures Act is jurisdictional. Hardin v. City Title & Escrow Co., 797 F.2d 1037 (D.C.Cir.1986). Hardin is inconsistent with these decisions, with the Supreme Court's decision in Irwin, and with our decision in Navco, and we therefore decline to follow it.
 
 
 29
 We have said nothing about United's third theory of Dearborn's obligation to it: that part of the money Dearborn paid was in settlement of tort claims that United had against Dearborn arising out of its repeated botching of the transactions that United had hired it to handle. If this was a bona fide settlement, the voluntary-payment doctrine clicks in and Lawyers Title as Dearborn's surrogate cannot undo the settlement on the basis of a mistake of law. (In contrast, as we stressed earlier, United had no colorable claim either to the bounced-check penalties or to the payment of illegal kickbacks.) Lawyers Title argues with considerable force that the evidence of these tort claims, and especially the evidence of their size, is unsatisfactory. But these are contestable, and unquestionably material, factual issues and so not properly resolved on summary judgment.
 
 
 30
 In summary, the judgment of the district court is affirmed insofar as it orders United to pay Lawyers Title so much of Dearborn's two checks to United as purports to discharge Dearborn's debt to United for the bounced-check penalty, but is otherwise vacated and the case remanded to determine whether the statute of limitations bars Lawyers Title from recovering the kickbacks and how much of the money that Dearborn paid United pursuant to the so-called tort settlements may be offset against Lawyers Title's claim. The district court may also have to consider Lawyers' alternative ground for recovery--that the two checks which Dearborn issued to United Financial were fraudulent conveyances either because Dearborn intended to defraud its creditors (other than United), 740 ILCS 160/5(a)(1), or because they were not supported by commensurate consideration and impaired the solvency of Dearborn, thus satisfying the twin requirements for fraudulent conveyance on a theory of constructive fraud. 740 ILCS 160/6(a); Scholes v. Lehmann, supra, 56 F.3d at 756.
 
 
 31
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH DIRECTIONS.
 
 
 32
 RIPPLE, Circuit Judge, dissenting.
 
 
 33
 Rule 54(b) of the Federal Rules of Civil Procedure "is limited expressly to multiple claims actions in which 'one or more but [fewer] than all' of the multiple claims have been finally decided and are found otherwise to be ready for appeal." Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 435, 76 S.Ct. 895, 899, 100 L.Ed. 1297 (1956). Rule 54(b) does not expand the jurisdiction conferred by 28 U.S.C. § 1291; "it does not relax the finality required of each decision...." 351 U.S. at 435, 76 S.Ct. at 899. Before entering judgment under Rule 54(b), therefore, "[a] district court must first determine that it is dealing with a 'final judgment.' It must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.' " Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 7, 100 S.Ct. 1460, 1464, 64 L.Ed.2d 1 (1980) (quoting Sears, Roebuck & Co., 351 U.S. at 436, 76 S.Ct. at 900). "Rule 54(b) ... does not cover a partial adjudication of a single claim, even if other claims are presented in the case." Indiana Harbor Belt R.R. v. American Cyanamid Co., 860 F.2d 1441, 1444 (7th Cir.1988).
 
 
 34
 The majority and the parties focus on Lawyers Title's demand for the return of the $566,000 paid by a Dearborn check to United. This demand is supported by two theories of liability: payment by mistake and fraudulent conveyance. The district court did not completely adjudicate this matter; it retained $70,000 of the claim for trial.[1] Having retained a portion of Lawyers Title's claim for later disposition, the district court did not create jurisdiction in this court by entering a purported Rule 54(b) judgment. See Indiana Harbor Belt R.R., 860 F.2d at 1444.
 
 
 35
 In an effort to justify the Rule 54(b) judgment, the majority parses even further the $566,000 check in an effort to find underlying "claims" that are analytically separate. Neither the manifest legislative policy of requiring a final decision as a predicate to appellate jurisdiction nor the case law of the circuit supports such an extension of Rule 54(b). The $70,000 "claim" retained by the district court arises out of an alleged contract whereby Dearborn agreed to pay a rental fee to United for using United's offices for closings. The fee for such use, as alleged, was $300 per closing if United was the mortgage lender and $100 if it was not. The district court determined that the $200 premium was a kickback and entered judgment with respect to the $200 premiums, but retained for trial the remaining "claim" for $70,000 ($100 multiplied by the relevant number of closings). The $300 payments, according to the majority, can be broken into separable claims: one claim includes the $100 portion of the payments and another the $200 portion.
 
 
 36
 I cannot concur with my colleagues that the rental contract can be dissected so that the fees paid under it reside in separate claims. Cf. Buckley v. Fitzsimmons, 919 F.2d 1230, 1238 (7th Cir.1990) (holding that different incidents were too related to give rise to separate claims for purposes of Rule 54(b)), vacated on other grounds, 502 U.S. 801, 112 S.Ct. 40, 116 L.Ed.2d 19 (1991). The majority asserts that the second appeal will not require us "to go over the same ground" covered by this appeal. Ante, at 1162. To be sure, we have said many times before that two claims are separate if the facts and legal theories of the two claims do not overlap to an unacceptable degree. See, e.g., NAACP v. American Family Mut. Ins. Co., 978 F.2d 287, 292 (7th Cir.1992), cert. denied, 508 U.S. 907, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993); Buckley, 919 F.2d at 1237-38; Olympia Hotels Corp. v. Johnson Wax Dev. Corp., 908 F.2d 1363, 1366-67 (7th Cir.1990). Yet the majority applies a seemingly unbounded interpretation of these cases; it asserts that the factual overlap between the two appeals will be "limited to the bare bones of the relationship between Dearborn and United--these bare bones constituting the background to the contract dispute retained by the district court." Ante, at 1163.[2] However, the "background" facts of the rental contract between Dearborn and United consist of, and will require the second appellate panel to learn (or relearn), most of the facts set forth in the majority and district court opinions. See Indiana Harbor Belt R.R., 860 F.2d at 1444 (noting that "the most important purpose behind the drafters' decision to confine the scope of Rule 54(b) to situations where one of multiple claims is fully adjudicated" is " 'to spare the court of appeals from having to keep relearning the facts of a case on successive appeals.' ") (quoting Jack Walters & Sons Corp. v. Morton Bldg., 737 F.2d 698, 702 (7th Cir.), cert. denied, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984)). The second appeal, if there is one, will require knowledge of the same three parties, the same $566,000 check, the same payment by mistake theory, the same rental contract, and the same rental payments.
 
 
 37
 True, the issues surrounding the $100 portions of the rental payments (e.g., whether a contract existed) are in some ways different from the issues surrounding the $200 portions (e.g., whether the premium was an illegal kickback). But, unlike 28 U.S.C. § 1292(b) (under which our review is discretionary and the district court's required findings are different), Rule 54(b) does not empower a district court to make an issue appealable. Buckley, 919 F.2d at 1236-37. Here, the district court effectively certified the issue whether the $200 premiums were unlawful kickbacks without satisfying the rigors of § 1292(b). See Tolson v. United States, 732 F.2d 998, 1000-01 (D.C.Cir.1984).
 
 
 38
 It is also unsettling the degree to which the litigation yet to occur in the district court may moot the issues decided in this appeal. If later litigation were to determine that there was never a contract for rental fees, for example, the question whether $200 of each $300 payment was an illegal kickback would be academic and today's opinion on that issue advisory. Other defenses to the $100 claim retained likewise could apply to the $200 claim decided. "The possibility that developments in the litigation may moot a claim suggests that appellate resolution be deferred" and "makes improvident the parties' and the judges' investment of resources to produce a speedy appellate ruling." Horn v. Transcon Lines, Inc., 898 F.2d 589, 592 (7th Cir.1990); accord id. at 593 ("Potential mootness ... augurs against immediate appeal."); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 580 (1st Cir.1994). Indeed, Lawyers Title could conceivably raise defenses at trial to the rental contract that would negate United's claim of right to the entire $566,000. As a result, the specter exists that this first appeal could be mooted in its entirety or, depending on the defenses raised by Lawyers Title at trial, legal issues duplicative of those in this appeal could present themselves in the second appeal. Lawyers Title may even resurrect its fraudulent conveyance theory; if successful, the issues decided today are resolved unnecessarily. Additionally, the principles of res judicata would preclude splitting the claims in this case--a fact that we have recognized as relevant, though not decisive. See NAACP v. American Family Mut. Ins. Co., 978 F.2d at 292; Olympia Hotels Corp., 908 F.2d at 1367.
 
 
 39
 The majority's approach, applied in such a liberal fashion, is totally undisciplined. It would, for instance, allow a district court to enter a Rule 54(b) judgment in a simple torts case upon deciding that the defendant is liable and that the plaintiff is entitled to a sum certain for an injured arm, although the court saves for trial the damages to be awarded on account of the plaintiff's injured leg. The second appeal in this hypothetical case would not require the appeals court to "cover the same ground" again; the factual overlap would be limited to the mere "background" facts of the accident and the second appeal would not likely concern the same legal issues. Nevertheless, it is manifest that a Rule 54(b) certification is improper if the district court has merely granted a partial summary judgment on the issue of liability when assessment of damages remains. See, e.g., Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 583 n. 21, 100 S.Ct. 800, 807 n. 21, 63 L.Ed.2d 36 (1980); Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 744, 96 S.Ct. 1202, 1206-07, 47 L.Ed.2d 435 (1976); 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2656, at 52-54 & n. 24. In this case, there has not even been a determination of liability (or non-liability) as to the rental contract, but merely a partial determination with respect to liability that Lawyers Title is entitled to $200 out of each $300 payment (or, stated conversely, that United is not entitled to a setoff of $200 of each $300 payment).
 
 
 40
 The majority's new approach to Rule 54(b) is simply too permissive to square with the congressional decision to require a "final decision" or with our case law. See Horn, 898 F.2d at 592 ("The tension between the presumptive rule of one appeal per case and the utility of segregating separate claims for immediate appeal makes it important to define a 'claim' with care, lest the exception swallow the rule."). Under its application, as exemplified by this case, Rule 54(b) orders embody the norm. Rule 54(b) judgments, however, are supposed to be the exception, not the rule. Buckley, 919 F.2d at 1237-38; Wright, Miller & Kane, supra, § 2656, at 47-48. "To avoid time-consuming duplicative appeals, the norm in litigation--embodied in the general rule that a final judgment is one that leaves nothing to be decided--is one appeal per case." United States v. Ettrick Wood Prods., Inc., 916 F.2d 1211, 1218 (7th Cir.1990) (per curiam); accord Horn, 898 F.2d at 592 ("Rule 54(b) departs from the norm of one appeal per case, a norm that prevents duplicative and time-consuming appeals."). Requiring Lawyers Title and United to litigate the $70,000 "claim" before proceeding in our court would have saved our time and probably eliminated the need for our deciding some or all of the issues tackled today. Accordingly, this case should be sent back to the district court for the resolution of the remaining $70,000 dispute. Afterwards, consistent with the approach to appellate jurisdiction chosen by the Congress, we would then be presented with one appeal.
 
 
 41
 Although our circuit has acknowledged, as a general proposition, the wisdom of the "pragmatic approach" to appellate jurisdiction announced by the Supreme Court in Brown Shoe Co. v. United States, 370 U.S. 294, 306, 82 S.Ct. 1502, 1513, 8 L.Ed.2d 510 (1962), we have also acknowledged that only the most disciplined pragmatism will preserve the congressional intent of making finality the general rule of federal appellate procedure. In this regard, our case law is consonant with that of the other circuits. See generally 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3913, at 464-65. We have sought to avoid adopting "a pretense of finality to explain a conclusion that really rests on a desire to relax the rigid jurisdictional character of finality requirements." Id. at 465. Today's decision sorely tests our perseverance to remain faithful to the congressional choice. I would dismiss this appeal for lack of jurisdiction.
 
 
 
 [1]
 Although counsel's view is not controlling, it is interesting to note that counsel for Lawyers Title conceptualized his client's claim in the same manner as I. Indeed, although counsel requested Rule 54(b) certification and contended on appeal that the certification was proper, counsel nevertheless held the belief that the district court did not fully adjudicate Lawyers Title's claim. When asked at oral argument, "[The district court] did not adjudicate your entire claim?" counsel responded flatly, "That is right."
 
 
 [2]
 Because it is sometimes difficult to determine whether the degree of factual overlap between two claims is so extensive that the claims are not separable, we have said that we shall not disturb a district court's discretion in this regard if "thoughtfully exercised." Buckley, 919 F.2d at 1237-38; accord Olympia Hotels Corp., 908 F.2d at 1367-68. No deference is due in this case, however, because the district court's order does not consider whether the retained claims are separate from those on appeal. See Buckley, 919 F.2d at 1238 (also stating that "district judges may not reflexively enter Rule 54(b) judgments just because the parties want to appeal"). Moreover, in its opinion explaining its reasoning and disposition, the district court treats Lawyers Title's right to recover the money as a functional claim for relief. The court treats the rental contract dispute primarily as a setoff claim of United